UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

STAUDINGER+FRANKE GMBH, ET AL.,                13 Cv. 6124 (JGK)

                  Plaintiffs,            MEMORANDUM OPINION AND
                                               ORDER

        - against -

PATRICK CASEY, ET AL.,

                 Defendants.

————————————————————————————

JOHN G. KOELTL, District Judge:

The plaintiffs, Andreas Franke, a photographer, and his company Staudinger+Franke GMBH ("Staudinger"), bring this action to recover money they never received for work that Franke performed. Pursuant to an oral agreement, defendant MCA Creative Services Inc., doing business as Marge Casey and Associates ("MCA"), agreed to represent Franke as his agent. After a decline in business and a falling out between defendant Patrick Casey, the Chief Executive Officer ("CEO") of MCA, and defendants Marge Casey and Elliot Abelson, the Sales Executive and Executive Producer, respectively, MCA became insolvent and ceased doing business. In a separate order, the Court is granting summary judgment for the plaintiffs on their claim for breach of contract against MCA for the undisputed money owed to the plaintiffs, in the amount of $400,484.97. The plaintiffs

also seek to recover from the individual defendants, in part on the theory that the individual defendants fraudulently transferred money to themselves out of MCA's general operating account.   The plaintiffs have also sued Casey Creative Group LTD ("CCG"), a company formed by Patrick Casey which the plaintiffs allege is a successor in liability to MCA.

The plaintiffs assert ten state law claims against the various defendants.   Defendants Patrick Casey, MCA, and CCG move for partial summary judgment dismissing some of the claims against them pursuant to Rule 56 of the Federal Rules of Civil Procedure, and defendants Marge Casey and Elliot Abelson move for summary judgment dismissing all claims against them.

The Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1332.

**I.**

The standard for granting summary judgment is well established.   "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1223 (2d Cir. 1994).   "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine

issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the

motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases).  If there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law.  Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of America, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012); see also Schutte Bagclosures Inc. v. Kwik Lok Corp., 48 F. Supp. 3d 675, 688 (S.D.N.Y. 2014).

## II.

The following facts are undisputed, except where otherwise noted.

### A.

MCA is a New York corporation incorporated in 1996 to represent photographers and other artists and provide production services to clients.  Local Rule 56.1 Statement of Undisputed Material Facts, Patrick Casey et al., ("PC 56.1 Stmt.") ¶¶ 1, 4-5; Plaintiffs' Response to Rule 56.1 Statement of Patrick Casey et al., ("PC 56.1 Resp.") ¶¶ 1, 4-5.  The positions of the individual defendants within MCA were not well defined at the outset.  Although Patrick Casey ("Patrick") incorporated MCA and was the sole shareholder and director when it was incorporated, Marge Casey ("Marge"), Patrick's mother, testified at her

deposition that this arrangement was due to tax liabilities she had at the time.  Marge Dep. 9-10.  MCA was formed shortly after Patrick graduated from college, and Patrick was put in charge of creative design issues within the company.  Marge Dep. 11-12. Although Marge directed the company's sales and Elliot Abelson ("Elliot"), her husband, handled production and finance, neither was an officer or stockholder of MCA.  Local Rule 56.1 Statement of Undisputed Material Facts, Marge Casey et al., ("MC 56.1 Stmt.") ¶¶ 3-5; Plaintiffs' Response to Rule 56.1 Statement of Marge Casey et al., ("MC 56.1 Resp.") ¶¶ 3-5; Marge Dep. 11-12; Patrick Dep. 22-23.

In August 2005, Franke, a photographer and Austrian citizen, and Staudinger, Franke's company, entered into an oral agreement with the defendants in which MCA would act as Franke's agent for commercial photography contracts.  PC 56.1 Stmt. ¶ 35; PC 56.1 Resp. ¶ 35.  The parties exchanged a written contract setting out the terms of MCA's representation, but neither party signed the contract.  See Pikus Decl. in Opp. to Mot. of Patrick Casey, et al. ("Pikus PC Decl.") Ex. B.  The contract was between MCA and Andreas Franke and Robert Staudinger, Franke's business partner.  Id.  While Franke contends that he believed that MCA, Patrick, and Marge were all representing him, the terms of the unsigned contract only designated MCA as Franke's agent.  Franke Dep. 16-17; Pikus PC Decl. Ex. B.

For at least the next few years, the arrangement was apparently a success.  MCA and the individual defendants arranged for photographic shoots for Staudinger for corporate clients such as Nike and Holland America.  PC 56.1 Stmt. ¶ 39; PC 56.1 Resp. ¶ 39.  After Staudinger performed its services, MCA invoiced the client.  PC 56.1 Stmt. ¶ 41; PC 56.1 Resp. ¶ 41.  Clients then paid MCA directly, and MCA deposited all funds into its general operating account.  PC 56.1 Stmt. ¶ 42; PC 56.1 Resp. ¶ 42.  MCA remitted 70% of the payment to Staudinger and retained a 30% commission.  PC 56.1 Stmt. ¶¶ 43-44; PC 56.1 Resp. ¶¶ 43-44.  Staudinger invoiced MCA alone, rather than Patrick or Marge.  PC 56.1 Stmt. ¶¶ 46-47; PC 56.1 Resp. ¶¶ 46-47.

As the economy faltered in the beginning of 2007, MCA's revenue began to decline.  Patrick Dep. 90-91.  MCA's revenue declined from about $10 million per year in 2007 to less than $1 million in 2012.  PC 56.1 Stmt. ¶ 16; PC 56.1 Resp. ¶ 16.  By the end of 2010, at the latest, MCA was insolvent.  Patrick Dep. 89-90.  After a falling out between Patrick on the one hand and Marge and Elliot on the other, Marge and Elliot left the company in June 2011.  MC 56.1 Stmt. ¶ 11; MC 56.1 Resp. ¶ 11; Marge Dep. 60-62.  Staudinger chose to continue doing business with Patrick and MCA instead of going with Marge, who started a new company shortly after leaving MCA.  Franke Dep. 134-35.

However, MCA began to accrue unpaid debts to Staudinger shortly before Marge and Elliot left.  From the end of January 2010 through the end of 2012, Staudinger clients paid MCA $400,484.97 for Staudinger's work, all of which MCA never remitted to Staudinger.  Elias Decl. Ex. G.  Only about $12,000 of the unpaid sum to Staudinger accrued before Marge and Elliot left the company.  MC 56.1 Stmt. ¶ 48; MC 56.1 Resp. ¶ 48.  In fact, Franke maintained that he was "paid with reasonable promptness" throughout the duration of Marge and Elliot's tenure at MCA, up until 2012.  Franke Certif. (ECF No. 59) ¶ 3.  In 2012, MCA ceased remitting payment to the plaintiffs, and at the end of the year, MCA ceased doing business.  Id. ¶ 4; PC 56.1 Stmt. ¶ 18; PC 56.1 Resp. ¶ 18.  MCA admits that it currently owes Staudinger $400,484.97.  PC 56.1 Stmt. ¶ 51; PC 56.1 Resp. ¶ 50. The plaintiffs contend that Patrick, Marge, and Elliot owe the plaintiffs that sum as well, which the individual defendants deny.

The plaintiffs also contend that MCA and Patrick reused some of Staudinger's photographs without Staudinger's authorization and without paying Staudinger.  In July 2012, Staudinger received an anonymous email attaching payments by MCA clients for the reuse of Staudinger's work.  Franke Dep. 44-46; Pikus PC Decl. Ex. E.  Thereafter, Franke requested invoices from MCA for these reuses, and billed MCA for Staudinger's

7

portion of the fees.  Franke Dep. 45-46; Pikus PC Decl. Ex. F.
Patrick admitted at his deposition that Staudinger was due
additional fees for the reusage of its work, and that it was an
oversight.  Patrick Dep. 73-74.  In total, the plaintiffs claim
that the defendants owe them $52,250 on the basis of their
conversion claim.  Compl. ¶ 25.

**B.**

Throughout the course of their employment, Patrick, Marge,
and Elliot all charged MCA for both business and personal
expenses, and company accountants recorded these accumulated
charges as "loans" from MCA to the individual defendants.  See
Marge Dep. 30-34; Elliot Dep. 127; Pikus PC Decl. Ex. G; Elias
Decl. Ex. E.  As of December 31, 2009, the "loan balance"
reported on MCA's General Ledger was $113,456.67 for Patrick,
$103,368.97 for Marge, and $94,006.84 for Elliot.  Elias Decl.
Ex. E.  Despite these charges being recorded as loans, Marge,
Patrick, and Elliot did not all see them this way.  Patrick
testified at his deposition that MCA made some loans to him for
personal expenses, and that the loan balances would either be
paid back or would "becom[e] compensation."  Patrick Dep. 104.
Marge believed that the personal expenses were a part of their
salaries, Marge Dep. 34-35, and Elliot categorically denied that
he owed any money to MCA, and stated that their ability to
charge MCA for some personal expenses was a "fringe benefit."

Elliot Dep. 116-20, 127.  Many of the expenses appear to be health-related, and Patrick stated that he, Marge, and Elliot agreed that MCA would compensate them for medical expenses, although this agreement was not in writing.  Patrick Dep. 105. Patrick indicated that MCA's accountants may have consolidated all of their personal, medical, and other expenses on the balance sheets as one "loan balance."  Id. at 108-11.

However the expenses were characterized, Patrick warned in June 2011 that the practice of charging them to the company should be halted while MCA was insolvent.  Specifically, he sent an email to Elliot dated June 15, 2011, in which he stated the following:

> Starting July 1st I think that no personal expenses with the exception of Home cable internet should be paid by the business.  This includes car, garage, personal insurances, trainers, etc.  I will practice this policy for myself as well.  Every Bankruptcy lawyer has urged me to make this change immediately.

Pikus PC Decl. Ex. I.  Nevertheless, Patrick continued to charge personal expenses to the company, including for items such as car services, restaurants, groceries, and medical expenses. Pikus PC Decl. Ex. J.

As of December 31, 2012, the "loan balance" sheets showed $213,694.75 for Patrick, $124,316.07 for Marge, and $63,359.01 for Elliot.  Elias Decl. Ex. E.  Therefore, from the beginning of 2010 until the end of 2012, roughly the period covering MCA's

insolvency, Patrick's balance increased by about $100,000, Marge's increased by about $20,000, and Elliot's decreased by about $30,000.  Although the ledger sheets are not entirely clear, there appear to be no personal expenses attributed to Marge or Elliot after mid-2011, when she and Elliot left MCA. Id.  At the end of 2012, Patrick, the only one of the three remaining at MCA, wrote off the entirety of his loan balance, but kept Marge and Elliot's loan balances on the books.  Id.

### C.

In early January 2012, Patrick incorporated CCG under New York law.  PC 56.1 Stmt. ¶ 23; PC 56.1 Resp. ¶ 23.  Three people contributed capital to CCG when it was formed, and then were made its only shareholders: Amanda Steinberger, a former MCA employee, Paul Schenk, Patrick's family friend, and Caroline Kliemerman, Patrick's wife.  PC 56.1 Stmt. ¶¶ 25-26; PC 56.1 Resp. ¶¶ 25-26; Patrick Dep. 33.  Patrick is the President of CCG, and is on the Board of Directors along with his wife, who has a separate full-time job.  PC 56.1 Stmt. ¶ 28; PC 56.1 Resp. ¶ 28; Patrick Dep. 34-35.

On December 31, 2012, MCA ceased its operations.  PC 56.1 Stmt. ¶ 18; PC 56.1 Resp. ¶ 18.  Pursuant to an asset purchase agreement dated January 1, 2013, CCG purchased assets from MCA, such as contracts and agreements, tangible assets, and client accounts.  PC 56.1 Stmt. ¶ 21; PC 56.1 Resp. ¶ 21; Kourland

Decl. Ex. J.  CCG paid MCA $10,000 for these assets, and pursuant to the agreement, CCG did not assume any of MCA's liabilities.  Kourland Decl. Ex. J.  CCG represents some of the talent that was previously represented at MCA, and also does business with clients that previously worked with MCA, such as Nike.  Patrick Dep. 36-37, 39-40.

### D.

Franke and Staudinger brought this action in late August 2013.  In the Complaint, the plaintiffs assert ten state law claims against Patrick, MCA, CCG, Marge, and Elliot.  In Count One, the plaintiffs assert a breach of contract claim against MCA and Patrick for the failure to remit the money that the plaintiffs are owed for their work.  Compl. ¶¶ 19-21.  In Count Two, the plaintiffs assert a claim for conversion against MCA and Patrick for the unauthorized reuse of Staudinger's photographs.  Id. ¶¶ 22-26.  Counts Three and Four concern equitable claims for the money that MCA failed to remit; Count Three asserts a claim for money had and received and is apparently asserted against all defendants, and Count Four asserts a claim of account stated against Patrick and MCA.  Id. ¶¶ 27-32.

In Counts Five through Eight, the plaintiffs allege claims of fraudulent conveyances against all defendants under various sections of the New York Creditor and Debtor Law.  Id. ¶¶ 33-49.

Finally, the plaintiffs assert a claim for breach of fiduciary duty against Patrick, MCA, and Marge in Count Nine, and a claim for constructive trust against Patrick, MCA, Marge, and Elliot in Count Ten, both of which relate to the money that MCA failed to remit to the plaintiffs.  Id. ¶¶ 50-58.

On September 23, 2014, after this case had been proceeding with discovery for some time, this Court issued a revised scheduling order indicating, among other things, that all discovery was to be completed by October 31, 2014, and that expert disclosures were due thirty days before the completion of discovery.  See Revised Civil Scheduling Order Dated Sept. 23, 2014 (No. 13cv6124, ECF No. 52).  The prior discovery schedule had required fact depositions to be concluded by June 6, 2014, expert reports to be exchanged by June 20, 2014, and expert depositions to be concluded by July 14, 2014.  Am. Joint Disc. Plan (No. 13cv6124, ECF No. 39).  On November 24, 2014, the parties cross-moved for summary judgment.  The plaintiffs moved for summary judgment against MCA for the approximately $400,000 that MCA admitted it owed to the plaintiffs, and the plaintiffs also moved to sever their fraudulent conveyance claims, arguing that the Court had postponed discovery on those claims. Patrick, MCA, and CCG moved for summary judgment dismissing some of the claims against them, and Marge and Elliot moved for summary judgment dismissing all of the claims against them.

On May 26, 2015, the Court held oral argument on all of the motions.  In a separate order, the Court is granting the plaintiffs' motion for summary judgment against MCA on Count One of the Complaint because it is undisputed that MCA owes $400,484.97 to the plaintiffs.  The Court is denying the plaintiffs' motion to sever because there is no basis for severance and no grounds for additional discovery, and the Court had never indicated that discovery would be postponed on the fraudulent conveyance claims.  This opinion resolves the defendants' summary judgment motions.  The parties' briefs assume that New York law applies for all of the claims, and "such implied consent . . . is sufficient to establish choice of law."  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted).

### III.

In connection with the plaintiffs' opposition to this motion, they submitted a report compiled by Ciro V. Cuono, a partner from O'Connor Davies LLP, as an expert witness on the subject of MCA's insolvency.  See Pikus PC Decl. Ex. L (the "Cuono Report").  In their reply briefs, the defendants move to exclude the Cuono Report for purposes of this motion, and that motion is **granted**.

The plaintiffs disclosed Cuono as an expert on October 31, 2014, thirty days after the Court-ordered date for expert

disclosure under Federal Rule of Civil Procedure 26(a).  See
Revised Civil Scheduling Order Dated Sept. 23, 2014 (No.
13cv6124, ECF No. 52); Elias Reply Decl. Ex. B.  The plaintiffs
provided the Cuono Report to the defendants on December 18,
2014, almost one month after the defendants filed their motions
for summary judgment.  See Cuono Report.  Finally, the
plaintiffs' disclosure of the Cuono Report did not include all
the information required by Rule 26(a)(2)(B), including the
qualifications, past testimony, and compensation of the
purported expert.

        Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a
party fails to provide information or identify a witness as
required by Rule 26(a) . . . the party is not allowed to use
that information or witness to supply evidence on a motion, at a
hearing, or at a trial, unless the failure was substantially
justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  When
determining whether to preclude a witness under Rule 37, the
pertinent considerations for a court include "(1) the party's
explanation for the failure to comply with [Rule 26(a)'s
disclosure requirement]; (2) the importance of the testimony of
the precluded witness; (3) the prejudice suffered by the
opposing party as a result of having to prepare to meet new
testimony; and (4) the possibility of a continuance."  Design
Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006)

                                14

(quoting <u>Patterson v. Balsamico</u>, 440 F.3d 104, 117 (2d Cir. 2006)) (brackets added).  The plaintiffs have offered no satisfactory explanation or excuse for their failure to abide by the Court's deadlines and failure to comply with Rule 26(a).  At oral argument, the plaintiffs suggested for the first time that they did not have enough time to produce expert disclosures in the time following the Court's revised scheduling order.  But at the time the Court entered that order, this case had been pending for over one year and discovery had been proceeding for several months, and the original deadline for the production of expert reports had already passed.  Moreover, the plaintiffs never protested that the new deadline for the completion of all discovery was insufficient.

As to the second Rule 37 consideration, the Cuono Report does not appear to add much to the existing evidence. Generally, it assembles the charges listed on the balance sheets into a more organized format, draws general conclusions about the types of charges, and makes the same conclusions about MCA's insolvency in the relevant time period that the defendants appear to have already admitted.  <u>See</u> Cuono Report.  Finally, despite its relatively minor importance, there would be prejudice in admitting it against the defendants on this motion because the plaintiffs did not disclose the report until after the defendants made this motion.  <u>See</u> <u>Chen v. New Trend Apparel,</u>

Inc., 8 F. Supp. 3d 406, 435 (S.D.N.Y. 2014) (finding prejudice and excluding report where defendants did not disclose report until after plaintiffs filed a summary judgment motion, "depriving [the plaintiffs] of timely access to [the expert's] analysis, on which [the defendants] now rely in opposing [the plaintiff's] motion").

Accordingly, the defendants' motion under Rule 37 to exclude the Cuono Report from consideration for purposes of this motion is **granted**.

### IV.

Defendant Patrick Casey moves for summary judgment dismissing the breach of contract claim against him. The Court has already granted summary judgment for the plaintiffs on their breach of contract claim against MCA. Patrick argues that the oral contract was only between the plaintiffs and MCA, and that as a corporate officer of MCA, he was not party to that contract in his individual capacity. The plaintiffs contend that their oral agreement was with MCA *and* Patrick.

The elements of a breach of contract claim under New York law are "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach." Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 402 (S.D.N.Y. 2012) (quoting IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.

Supp. 2d 395, 402 (S.D.N.Y. 2009)).  In this case, the parties dispute the first element: whether a contract was formed between the plaintiffs and Patrick.  In order for a contract to have been formed, both parties must have mutually assented to be bound by the contract, and "a party cannot be held to have contracted if there was no assent or acceptance." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (internal quotation marks omitted).  "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which *evinces the intention of the parties to contract*." Id. (emphasis in original) (internal quotation marks omitted). In determining whether an oral contract was formed, the intent of the parties should be determined by the totality of the circumstances. R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 74-75 (2d Cir. 1984).

In this case, the plaintiffs allege that Patrick was a party to the agreement to represent the plaintiffs, but the only evidentiary support they point to is Franke's deposition testimony that he understood Patrick to be representing him pursuant to the contract.  Franke Dep. 16-17.  One party's subjective understanding of a contract plainly does not bind another party to that contract.  See Faulkner v. Nat'l Geographic Soc., 452 F. Supp. 2d 369, 377-78 & n.41 (S.D.N.Y. 2006) ("[S]tatements of subjective intention uncommunicated to

the other contracting party are immaterial in construing the
terms of the contract." (internal quotation marks omitted))
(collecting cases), aff'd sub nom. Ward v. Nat'l Geographic
Soc'y, 284 F. App'x 822 (2d Cir. 2008); 1 R. Lord, Williston on
Contracts § 3:4 (4th ed.) ("The assent necessary in order to
form an informal contract is operative only to the extent that
it is outwardly, objectively manifested.").  By contrast, all of
the objective evidence indicates that the agreement was strictly
between the plaintiffs and MCA.  The written contract that was
initially exchanged by the parties designated MCA as Franke's
representative.  See Pikus PC Decl. Ex. B.  Although this
contract was never signed by the parties, the parties appeared
to follow its terms generally, adhering to the same billing,
compensation, and photography assignment arrangements identified
in the contract.  The parties' course of conduct also
demonstrated that only MCA was acting as the plaintiffs' formal
representative—MCA invoiced the clients, the plaintiffs invoiced
MCA, and MCA paid the plaintiffs.  PC 56.1 Stmt. ¶¶ 41-42, 46-
47; PC 56.1 Resp. ¶¶ 41-41, 46-47; see Register.com, 356 F.3d at
431 (analyzing parties' course of conduct in determining intent
to be bound).

     In sum, all of the objective evidence indicates that only
MCA assented to the contract with Franke and that Patrick only
acted as MCA's corporate officer.  A "corporate officer who

executes a contract acting as an agent for a disclosed principal is not liable for a breach of the contract unless it clearly appears that he or she intended to bind himself or herself personally." Stamina Products, Inc. v. Zintec USA, Inc., 935 N.Y.S.2d 629, 630-31 (App. Div. 2011) (reversing denial of summary judgment for defendant and ordering the dismissal of breach of contract claim where defendant only acted in corporate capacity). "There must be clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." Id. at 631 (internal quotation marks omitted). Franke and Staudinger have fallen well short of showing clear and explicit evidence of Patrick's intent to bind himself personally in the agreement. Because Patrick never assented to be bound to the contract with the plaintiffs, Patrick's motion for summary judgment dismissing the breach of contract claim against him is **granted.**

**V.**

Patrick and MCA move for summary judgment dismissing the plaintiffs' state law claim for conversion—the second count in the Complaint. The arguments in both parties' briefs on this subject bear little relation to the conversion claim spelled out in the Complaint. In the Complaint, the plaintiffs allege that between November 19, 2009, and October 7, 2010, MCA and Patrick "reused plaintiffs' works without compensation or authorization

from plaintiffs," causing the plaintiffs $52,250.00 in damages. Compl. ¶¶ 23, 25.  However, the parties' briefs only discuss the defendants' alleged failure to remit the roughly $400,000 to the plaintiffs.

Under New York law, "[c]onversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession."  LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks omitted).  The plaintiffs allege that Patrick and MCA reused Staudinger's photographs without authorization from Staudinger or paying Staudinger, and the plaintiffs have submitted MCA invoices attesting to such reuse. See Pikus PC Decl. Ex. F.  The defendants have submitted no evidence and made no argument in opposition to this claim. Accordingly, there is a genuine material issue of fact as to whether Patrick and MCA converted Staudinger's photographs, and the defendants' motion for summary judgment as to this claim is **denied.**

## VI.

In Counts Three and Four of the Complaint, the plaintiffs assert two equitable theories of liability—a claim for money had and received against all defendants, and a claim for account stated against Patrick and MCA.  The underlying wrong alleged in these claims is the same—the defendants' failure to remit

roughly $400,000 in payment to the plaintiffs.  The defendants
move for summary judgment dismissing these claims.  The
individual defendants argue that neither claim can stand because
only MCA, not the individual defendants, received money from and
had an account with the plaintiffs.  MCA argues that both claims
are duplicative of the breach of contract claim against it.  The
defendants are correct on both arguments.

Under New York law, an action for money had and received
lies when "(1) defendant received money belonging to plaintiff;
(2) defendant benefitted from the receipt of money; and (3)
under principles of equity and good conscience, defendant should
not be permitted to keep the money." Aaron Ferer & Sons Ltd. v.
Chase Manhattan Bank, Nat. Ass'n, 731 F.2d 112, 125 (2d Cir.
1984).  A claim for account stated under New York law requires
"'an agreement between the parties to an account based upon
prior transactions between them . . . .'" LeBoeuf, Lamb, Greene
& MacRae, L.L.P. v. Worsham, 185 F.3d 61, 64 (2d Cir. 1999)
(quoting Chisholm-Ryder Co. v. Sommer & Sommer, 421 N.Y.S.2d
455, 457 (App. Div. 1979)).  "Such an agreement may be implied
if 'a party receiving a statement of account keeps it without
objecting to it within a reasonable time' or 'if the debtor
makes partial payment.'" Id.; see also Meadowbrook-Richman,
Inc. v. Associated Fin. Corp., 325 F. Supp. 2d 341, 360
(S.D.N.Y. 2004).  "There can be no account stated where no

account was presented or where any dispute about the account is shown to have existed." Abbott, Duncan & Wiener v. Ragusa, 625 N.Y.S.2d 178, 178 (App. Div. 1995).

There is no genuine material dispute of fact in this case regarding the payment structure in place between Staudinger's clients, MCA, and Staudinger, or regarding the payment history between MCA and Staudinger.  Staudinger performed services for clients, MCA billed the clients and then deposited the funds from clients into an MCA account, and then MCA paid Staudinger out of that account.  Patrick Dep. 62; PC 56.1 Stmt. ¶¶ 41-44; PC 56.1 Resp. ¶¶ 41-44.  No individual defendant ever received money belonging to the plaintiffs in his or her individual capacity, and the plaintiffs never presented an account to any of the individual defendants and sought payment from them.  The plaintiffs have not offered sufficient proof to sustain either claim against any of the individual defendants.  See, e.g., Grain Traders, Inc. v. Citibank, N.A., 960 F. Supp. 784, 793 (S.D.N.Y. 1997) (dismissing claim for money had and received where defendant did not receive money belonging to the plaintiff), aff'd, 160 F.3d 97 (2d Cir. 1998); Cadwalader, Wickersham & Taft v. Klear, 755 N.Y.S.2d 598, 598 (App. Div. 2003) (affirming summary judgment grant dismissing plaintiff's account stated claim where the plaintiff did not establish "that there was an agreement that the individual defendants would be

personally liable for the services provided to the corporate

defendant"). Accordingly, the plaintiffs' claim for money had

and received in Count Three of the Complaint against Patrick,

Marge, and Elliot is **dismissed,** and the plaintiffs' claim for

account stated in Count Four against Patrick is **dismissed.**

As against MCA, the claims in Counts Three and Four are

duplicative of the breach of contract claim and must be

dismissed. This Court has already granted judgment for the

plaintiffs against MCA for $400,484.97, a sum the parties agree

is the amount that MCA failed to remit to the plaintiffs. The

plaintiffs' claims against MCA for money had and received and

account stated seek the same relief that the Court has already

granted. Accordingly, they must be dismissed as duplicative.

See, e.g., Indep. Order of Foresters v. Donald, Lufkin &

Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998) (affirming

dismissal of a claim for money had and received because there

was a "valid contract between the parties respecting the matter

at issue"); Media Tenor Int'l AG v. Medco Health Solutions,

Inc., No. 13cv7223, 2014 WL 2933215, at *8 (S.D.N.Y. June 27,

2014) (dismissing account stated claims as duplicative because

they sought the same relief as a breach of contract claim). The

plaintiffs' claims in Counts Three and Four against MCA are

**dismissed.**

**VII.**

In Counts Five through Eight of the Complaint, the plaintiffs assert claims for fraudulent conveyances against all defendants under §§ 273-76 of the New York Debtor and Creditor Law.[1]  Only Marge and Elliot move for summary judgment dismissing all of these claims against them.

Sections 273, 274, and 275 of the New York Debtor and Creditor Law allow for recovery by creditors of constructively fraudulent transfers by debtors.  Under § 273, "if a conveyance is made without fair consideration and the transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the conveyance is deemed constructively fraudulent." Amusement Indus., Inc. v. Midland Ave. Associates, LLC, 820 F. Supp. 2d 510, 526 (S.D.N.Y. 2011) (internal quotation marks omitted); N.Y. Debt. & Cred. Law § 273.  Section 274 and 275 are parallel statutes that render a transfer without fair consideration fraudulent where the debtor is left with unreasonably small capital for a pending or imminent business transaction, see N.Y. Debt. & Cred. Law § 274; or the debtor intends or believes that he will incur debts beyond his ability to pay them as they mature, see id. § 275; Amusement Indus., 820

---

[1] At oral argument of the motions, the plaintiff explained that only Counts Three and Five were asserted against CCG.

F. Supp. 2d at 526-27.  On the other hand, a creditor seeking recovery under § 276 must show "*actual intent*, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors."  N.Y. Debt. & Cred. Law § 276 (emphasis added).  The plaintiff's brief does not distinguish much between these separate claims and there is no need to belabor the differences here, because all of the claims against Marge and Elliot fail for the same reason: the plaintiff has not identified any conveyances made to or by Marge and Elliot without fair consideration.

Section 272(a) applies to all of the constructive fraudulent conveyances statutes, and provides that "[f]air consideration is given for property, or obligation . . . [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."  N.Y. Debt. & Cred. Law § 272. Generally, it is the plaintiffs' burden to demonstrate that transfers were made without fair consideration and without good faith.  United States v. McCombs, 30 F.3d 310, 324 (2d Cir. 1994).  A party seeking to set aside a conveyance on the basis of lack of good faith must prove one of the following factors is lacking: "(1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the

fact that the activities in question will hinder, delay, or defraud others." <u>Southern Indus. v. Jeremias</u>, 411 N.Y.S.2d 945, 949 (App. Div. 1978).

In arguing that Marge and Elliot transferred money from MCA to themselves without fair consideration while MCA was insolvent, the plaintiffs point principally to the "loans" made from MCA to Marge and Elliot for personal expenses.[2]  It is not entirely clear what the balances attributed to Marge and Elliot represent.  Many of the expenses appear to be personal, including medical, dental, and physical therapy expenses, and some appear to be business-related.  <u>See</u> Elias Decl. Ex. E.  As described in Section II.A of this opinion, the opaque picture presented by the parties regarding the balance sheets may be a result of loose accounting practices at MCA.  Nevertheless, it is sufficiently clear that the "loans" to Marge and Elliot were either a compensatory benefit they received only while they were employed by MCA, or loans that are still on MCA's books. Moreover, it is undisputed that in the period of MCA's insolvency, Marge's balance only increased by $20,000, and Elliot's decreased by roughly $30,000.

The plaintiffs have not met their burden in showing that these loan balances constitute fraudulent transfers to Marge and

---

[2] The plaintiffs had argued that Marge and Elliot's motion should be denied because the fraudulent conveyance claims should be severed and that additional discovery is warranted, but the Court has already rejected that argument.

Elliot without fair consideration. To the extent the balances constituted salary, they are "presumed to be made for fair consideration," unless the plaintiffs establish that they were made "in bad faith or the payments were excessive in light of the Defendants' employment responsibilities." In re TC Liquidations LLC, 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011); see Cilco Cement Corp. v. White, 390 N.Y.S.2d 178, 178 (App. Div. 1976) (holding that the salary paid to the president of the company was not a fraudulent conveyance because there was "no evidence that his salary was either excessive or unreasonable, or that the corporation did not receive full value in return"). The personal charges attributed to Marge and Elliot appear to have accrued only when they were still employed by MCA, and the plaintiff does not argue that these were excessive in comparison with the services they provided to MCA.

To the extent that Marge and Elliot's "loan balances" are indeed loans to Marge and Elliot, they appear to remain on MCA's books because Patrick only wrote off his own loans, and not Marge and Elliot's. Therefore, they would still be recoverable by a Trustee for MCA in the event that MCA were to go into bankruptcy. See, e.g., 11 U.S.C. § 542. But the plaintiffs may not recover such sums in this litigation through fraudulent transfer claims without proving the existence of transfers made without fair consideration and a lack of good faith. See

27

<u>Commodity Futures Trading Comm'n v. Walsh</u>, 3 F. Supp. 3d 70, 77–78 (S.D.N.Y. 2014) (granting summary judgment for defendant where plaintiffs failed to demonstrate lack of good faith). Accordingly, Marge and Elliot's motion for summary judgment as to Counts Five through Eight is **granted**, and the plaintiffs' fraudulent conveyance claims against them are **dismissed.**

### VIII.

In Counts Nine and Ten of the Complaint, the plaintiffs assert claims for breach of fiduciary duty against Patrick, MCA, and Marge, and a claim for a constructive trust against Patrick, MCA, Marge, and Elliot.  In Count Nine, the plaintiffs claim that MCA, Patrick, and Marge violated their fiduciary duties to the plaintiffs by failing to remit the sums due to the plaintiffs and by engaging in the diversion of MCA's funds.  In Count Ten, the plaintiffs allege that MCA, Patrick, Marge, and Elliot were constructive trustees for the sums that clients paid for the plaintiffs' work.  All of the defendants against whom these claims are asserted move for summary judgment dismissing these claims.

### A.

To allege a breach of fiduciary duty, the plaintiffs must show "the existence of a fiduciary relationship, misconduct by the defendant, and damages directly caused by the [defendants'] misconduct."  <u>Kurtzman v. Bergstol</u>, 835 N.Y.S.2d 644, 646 (App.

Div. 2007).  The defendants argue that no fiduciary relationship existed between each of them and the plaintiffs.

"Under New York law, a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."  Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 289 (S.D.N.Y. 1995). Attorney/client and doctor/patient relationships are two representative examples of such a relationship.  Id.  However, "a conventional business relationship does not create a fiduciary relationship in the absence of additional factors." Id. (quoting Feigen v. Advance Capital Management Corp., 541 N.Y.S.2d 797, 799 (App. Div. 1989)).  "[P]arties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree," or if "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party."  Calvin Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000).

The evidence in the record shows that the relationship between MCA and the plaintiffs was a conventional business relationship, governed by the oral contract between them.  There

is no evidence that the individual defendants, who are not
parties to the contract, or MCA specifically agreed to bear a
fiduciary relationship or assume any additional duties that
required the plaintiffs "to repose trust and confidence" in the
defendants.  Id.  The plaintiffs cite Reznor v. J. Artist Mgmt.,
Inc., 365 F. Supp. 2d 565 (S.D.N.Y. 2005), in which the court
held that a reasonable jury could find the plaintiff-musician
had a fiduciary relationship with the defendant-manager.  Id. at
574.  But in that case, the musician and his manager were
friends and co-owners of four businesses, leading the court to
conclude that the manager had a "special position as trusted
advisor."  Id. at 568-70, 574.  The plaintiffs point to no such
additional factors in this case to show that they had anything
but a conventional business relationship with the defendants,
albeit one governed by an oral agreement.  While they argue that
they were especially reliant on the defendants' services because
Franke was often in Austria, that is not sufficient to create a
fiduciary relationship.  See, e.g., Atlantis Info. Tech., GmbH
v. CA, Inc., 485 F. Supp. 2d 224, 231-32 (E.D.N.Y. 2007) ("Both
parties are commercial companies and although the Plaintiff
contends that it had trust and confidence in the Defendant, that
is not extraordinary.").

The plaintiffs also argue that the defendants owed a
fiduciary duty to the plaintiffs as their agent.  But although

MCA may have been the plaintiffs' talent agent in the sense that it coordinated Franke's photographic shoots, more is required to establish a formal agency relationship.  An agency relationship requires a showing of (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) "the parties' understanding that the principal is to be in control of the undertaking."  Cabrera v. Jakabovitz, 24 F.3d 372, 386 (2d Cir. 1994) (internal quotation marks omitted).  In this case, the plaintiffs have offered no evidence to show that they exercised control over MCA or any of the defendants.  In fact, in arguing that they put so much trust in the defendants that the plaintiffs were in the defendants' control, they suggest the opposite.  Therefore, the "essential element" of an agency relationship, control, is lacking in this case.  Mouawad Nat. Co. v. Lazare Kaplan Int'l Inc., 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007).

Finally, the plaintiffs contend that when MCA became insolvent, the fiduciary duties of MCA and its director, Patrick,[3] expanded so that those defendants owed fiduciary duties to corporate creditors, including the plaintiffs.  In some situations, creditors may recover from an insolvent corporation and its directors for mismanagement of corporate funds.  In re

---

[3] The plaintiffs contend that this basis should apply to Marge as well, but there is no evidence that Marge ever became a director of MCA.

STN Enterprises, 779 F.2d 901, 904-05 (2d Cir. 1985)

("[A]lthough in most states directors of a *solvent* corporation

do not owe a fiduciary duty to creditors, quite the reverse is

true when the corporation becomes insolvent."). However, the

plaintiffs cite no case in which contract creditors were

permitted to assert a *direct* breach of fiduciary duty claim

against an insolvent corporation and its director, as opposed to

a derivative claim. See In re Adelphia Commc'ns Corp., 323 B.R.

345, 386 n.140 (Bankr. S.D.N.Y. 2005) ("[E]ven in in the case of

an insolvent firm, poor decisions by directors that lead to a

loss of corporate assets and are alleged to be [] breaches of

equitable fiduciary duties *remain harms to the corporate entity*

*itself*. Thus . . . *these claims remain derivative*." (emphasis in

original) (quoting Prod. Res. Group, L.L.C. v. NCT Group, Inc.,

863 A.2d 772, 792 (Del. Ch. 2004))).

"[T]he duty that directors owe to the creditors of an

insolvent corporation under New York law is defined primarily by

the 'trust fund doctrine.'" RSL Commc'ns PLC v. Bildirici, 649

F. Supp. 2d 184, 202 (S.D.N.Y. 2009) (quoting Credit Agricole

Indosuez v. Rossiyskiy Kredit Bank, 729 N.E.2d 683, 688 (N.Y.

2000)), aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v.

Fisher, 412 F. App'x 337 (2d Cir. 2011). Under the trust fund

doctrine, liability may be imposed "on corporate directors or

transferees for wrongful dissipation of assets of an insolvent

corporation, in actions later brought by court-appointed receivers, trustees in bankruptcy or judgment creditors." Credit Agricole, 729 N.E.2d at 688.  Thus, New York courts have "followed the general rule that [] simple contract creditor[s]," such as the plaintiffs in this case, "may not invoke the doctrine to reach transferred assets before exhausting legal remedies by obtaining judgment on the debt and having execution returned unsatisfied."  Id.  Accordingly, the plaintiffs may not recover from Patrick or MCA through a direct breach of fiduciary claim in the present action.[4]

In light of the foregoing, the defendants' motion for summary judgment dismissing the plaintiffs' claim for breach of fiduciary duty is **granted** and Count IX of the Complaint is **dismissed.**

**B.**

The final count of the Complaint, Count Ten, asserts a claim for constructive trust against MCA, Patrick, Marge, and Elliot, and all of those defendants move for summary judgment dismissing this claim.

---

[4] Moreover, even if MCA owed a fiduciary duty to the plaintiffs, the plaintiffs' claim against MCA would still be dismissed as duplicative of their breach of contract claim against MCA.  See, e.g., Atlantis Info., 485 F. Supp. 2d at 232 (granting motion to dismiss because "the breach of fiduciary duty claim is based upon the same allegations contained in the first count of the amended complaint to recover damages for breach of contract").

"New York law generally requires four elements for a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment."  In re First Cent. Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004) (internal quotation marks omitted).  New York courts applying this doctrine should be sensitive "to the need for flexibility, and thus on occasion have not required a fiduciary relationship in order to impose a constructive trust." In re Koreag, Controle et Revision S.A., 961 F.2d 341, 354 (2d Cir. 1992).  Nevertheless, the Court of Appeals in Koreag did not disgard the first factor entirely, holding that the subject of the trust, the liquidator of an insolvency estate, was "acting in *some* fiduciary capacity toward *some* entities."  Id. (emphasis in original).  Courts regularly dismiss claims for a constructive trust when addressing conventional business relationships where nothing approaching a confidential or fiduciary relationship exists.  See, e.g., 101 McMurray, LLC v. Porter, No. 10cv9037, 2012 WL 997001, at *14 (S.D.N.Y. Mar. 26, 2012); Atateks Foreign Trade Ltd. v. Dente, 798 F. Supp. 2d 506, 507-08 (S.D.N.Y. 2011); Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009) (collecting cases).  Because there are no facts supporting the existence of a confidential or fiduciary relationship between the defendants and the

34

plaintiffs, and because there are no similar circumstances to Koreag that would warrant dispensing with this requirement, Count Ten of the Complaint should be dismissed.

Moreover, the constructive trust claim in Count Ten should be dismissed for additional reasons. "[A]s an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." First Cent., 377 F.3d at 215 (internal quotation marks omitted). In this case, the plaintiffs have a breach of contract claim against MCA, and indeed the receipt of the clients' funds and the duty to pay a portion of those funds to the plaintiffs is the essence of the contract. The plaintiffs are receiving summary judgment on their breach of contract claim and the constructive claim against MCA should therefore be dismissed as duplicative. See, e.g., Pena v. Guzman, No. 03cv5130, 2004 WL 253331, at *2-3 (S.D.N.Y. Feb. 11, 2004) (dismissing constructive trust claim as duplicative of breach of contract claim).

As to Patrick, Marge, and Elliot, the plaintiffs have not shown that they ever received funds from clients and thus cannot satisfy the unjust enrichment prong of the constructive trust claim. Unjust enrichment requires that a party hold property "under such circumstances that in equity and good conscience he ought not to retain it." First Cent., 377 F.3d at 213 (quoting Miller v. Schloss, 113 N.E. 337, 339 (N.Y. 1916) (internal

quotation marks omitted)).  MCA received the funds and the funds went into the MCA general account.  Because the individual defendants never received funds, there are no funds for them to return to avoid their being unjustly enriched.

Therefore, the motion for summary judgment dismissing Count Ten is **granted** and Count Ten is **dismissed.**

## IX.

The plaintiffs also assert claims against Patrick's current business, CCG, seeking to hold CCG liable as a successor in liability to MCA due to CCG's purchase of MCA's assets.  At oral argument on the motions, the plaintiffs explained that they sought to sue CCG only on Counts Three and Five of the Complaint.  CCG moves for summary judgment solely on the ground that it is not a successor in liability to MCA, and thus cannot be held liable for either of those claims.

Ordinarily, a corporation that purchases the assets of another corporation is not liable for the seller corporation's liabilities.  Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003).  New York recognizes four common-law exceptions to this rule, applying to: "1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who de facto merged with a seller; and (4) a buyer that is a mere continuation of a seller."  Id.  In

this case, the plaintiffs contend that the second exception
applies, arguing that Patrick is using CCG to hide MCA's assets
and defraud creditors.  CCG responds that there is no evidence
in the record that any fraud took place.

Viewed in the light most favorable to the plaintiffs, there
is a genuine dispute as to material facts concerning whether
CCG's asset purchase agreement and the forgiveness of Patrick's
"loan balance" were intended to defraud MCA's creditors by
shielding MCA's assets from creditors.  When a party has shown
that a fraudulent transfer has taken place in order to defraud
creditors, the fraud exception to successor liability may apply.
See, e.g., Silverman Partners LP v. Verox Grp., No. 08cv3103,
2010 WL 2899438, at *6 (S.D.N.Y. July 19, 2010) (denying motion
to dismiss where the plaintiff sufficiently alleged that the
successor corporation was created "to avoid the debts and
obligations which [the defendant] owed to Plaintiff"); I.P.S.,
Inc. v. Interglobal Video Div. of Music Express Fin. Corp., No.
86cv8019, 1989 WL 66672, at *2 (S.D.N.Y. June 14, 1989) (denying
summary judgment motion where the plaintiff alleged that the
defendant-corporation was formed in order to defraud creditors
of other defendants).  In showing that a fraudulent transfer
took place under § 276 of the New York Debtor and Creditor Law,
"[a]ctual fraudulent intent . . . may be inferred from the
circumstances surrounding the transaction, including the

relationship among the parties and the secrecy, haste, or unusualness of the transaction." HBE Leasing Corp. v. Frank, 48 F.3d 623, 639 (2d Cir. 1995).  When inferring actual intent, courts rely on "badges of fraud," which include "(1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance." Scantek Med., Inc. v. Sabella, 583 F. Supp. 2d 477, 497 (S.D.N.Y. 2008).

Several badges of fraud are present as to CCG's purchase of assets from MCA on January 1, 2013.  Although MCA received consideration (the parties have not argued about whether it was fair), "the absence of consideration is not necessary to stating a claim of actual fraudulent conveyance." Cadle Co. v. Newhouse, No. 98cv5945, 2000 WL 1721131, at *4, n.2 (S.D.N.Y. Nov. 16, 2000), vacated on other grounds, 20 F. App'x 69 (2d Cir. 2001).  Patrick and his wife are the only directors of CCG, and the only other officer is a former MCA employee.  Patrick Dep. 33-35.  MCA conveyed the assets while it was insolvent, and the asset purchase agreement took place the day after the defendants admit that MCA ceased doing business.  PC Rule 56.1 Stmt. ¶¶ 18, 21-22.  Therefore, at least three badges of fraud

are present—a close relationship between the parties, retention
of control, and suspicious timing—and the defendant has not
submitted any evidence to counter an inference of fraud.  See
Topever Corp. v. ENE Grp. LLC, No. 12cv869, 2013 WL 822378, at
*3 (S.D.N.Y. Mar. 6, 2013) (holding that the plaintiff stated a
claim of successor liability based on fraud where at least three
badges of fraud were present).  Moreover, the plaintiffs allege
that Patrick fraudulently transferred MCA assets to himself, in
part because Patrick wrote off the entirety of his "loan
balance" of over $200,000 at a time when MCA was insolvent.  See
Elias Decl. Ex. E.   Patrick has not moved for summary judgment
on those claims.  Accordingly, there is a genuine issue of
material disputed fact as to whether Patrick formed CCG to
prevent MCA's creditors from reaching MCA assets, and CCG's
motion for summary judgment is **denied.**

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the reasons explained above, Marge Casey and Elliot Abelson's motion for summary judgment is **granted**, and the motion for summary judgment by Patrick Casey, MCA, and CCG is **granted in part and denied in part.  The Clerk is directed to close Docket Nos. 62 and 66.**


**SO ORDERED.**

**Dated:     New York, New York
           June 6, 2015**                    _____/s/_____
                                                      **John G. Koeltl**
                                             **United States District Judge**